David F. Mull (#9597)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, UT 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
David.Mull@slcgov.com

*Attorney for Defendants Officer Matthew Farillas; Chief Mike Brown; and Salt Lake City*
*Corporation*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GOLDA BARTON, individually and as mother and guardian of L.C., a minor child; MICHAEL CAMERON, individually and as father of L.C., | **MOTION TO DISMISS** |
| Plaintiffs, | |
| vs. | |
| OFFICER MATTHEW FARILLAS, in an individual and official capacity; CHIEF MIKE BROWN, in an official capacity as police chief of the Salt Lake City Police Department; SALT LAKE CITY CORPORATION; and DOE DEFENDANTS 1 THROUGH 10, | Case No. 2:20-cv-832 |
| Defendants. | Judge Robert J. Shelby |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF MATERIAL FACTS ...................................................................... 4

    A.    L.C. Is "Out of Control," Possibly Armed, and Has Threatened to Shoot Someone, So Barton Calls 911 Asking for Police to Take Him to Psychiatric Treatment. ............................................................................... 6

    B.    Officers Meet with Barton and Strategize About How to Deal with L.C. While Minimizing Risks to All Involved. ........................................ 8

    C.    Officers Approach L.C.'s House to Talk to Him. ................................... 11

    D.    L.C. Flees into the Dark Alley Behind the House, Defies Officers' Commands, and Officers Pursue Him. ..................................................... 12

    E.    L.C. Stops Running, Turns, Moves His Hands Near His Waistband, and Refuses to Surrender. ........................................................................ 13

ARGUMENT .............................................................................................................. 15

    I.    RULE 12(B)(6) STANDARD OF REVIEW ........................................ 15

    II.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY. .................. 16

        A.    Plaintiffs Must Cite Binding Precedent Involving Similar Facts to Show that "Clearly Established" Law Forbade Officer Farillas's Conduct in the Circumstances Alleged Here. ................................................... 18

    III.    THE STATE CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED FOR THE SAME REASONS AS THE FEDERAL EXCESSIVE FORCE CLAIMS. 23

CONCLUSION ........................................................................................................... 26

# **TABLE OF AUTHORITIES**

## **Cases**

*Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697 (10th Cir. 2014) ............................................. 15, 16

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) ....................................................................... 21

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................................ 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 15, 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 15, 16

*Bond v. City of Talequah*, 981 F.3d 808 (10th Cir. 2020) ............................................................ 22

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ................................................................................... 19

*Burke v. City of Talequah*,
    Case No. CIV-18-257-RAW, 2019 WL 4674316 (E.D. Okla. Sept. 25, 2019) ...................... 21

*Cavanaugh v. Woods Cross City*, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, (D. Utah Dec.
    14, 2009), *aff'd*, 625 F.3d 661 (10th Cir. 2010) .......................................................................... 25

*City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156 (1997) ............................................. 24

*City of Talequah v. Bond*, 595 U.S. ___, 142 S. Ct. 9 (2021).............................. 19, 20, 21, 22, 23

*Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*,
    680 F.3d 1194 (10th Cir. 2011)..................................................................................................... 4

*Estate of Valverde v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) .................................................... 16

*Farrell-Cooper Min. Co. v. United States DOI*, 728 F.3d 1229 (10th Cir. 2013) ....................... 16

*Gallagher v. Shelton*, 587 F.3d 1063 (10th Cir. 2009) ................................................................ 15

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) ............................................................. 18

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015).......................................................................... 20

*Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2000) ...................................................................... 17

*Mglej v. Garfield Cty.*, No. 2:13-CV-713, 2014 WL 2967605 (D. Utah July 1, 2014)............... 25

*Mullenix v. Luna*, 577 U.S. 7 (2015)..................................................................................... 16, 20

*Needham v. Fannie Mae*, 854 F. Supp. 2d 1145 (D. Utah 2012) ................................................. 4

*Pahls v.Thomas*, 718 F.3d 1210 (10th Cir. 2013)........................................................................ 17

*Palacios v. Salt Lake City Police Dep't*,
    Case No. 2:20-cv-00714-DBB, 2022 WL 605005, (D. Utah March 1, 2022) ..........................19

*Pearson v. Callahan*, 555 U.S. 223 (2009)............................................................................ 17, 18

*Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005) ..................................................................... 17

*Rowell v. Bd. of Cty. Comm'rs. of Muskogee Cty., Okla.*, 978 F.3d 1165 (10th Cir. 2020)......... 16

*Saucier v. Katz*, 533 U.S. 194 (2001) ................................................................................... 17, 19

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................................... 16

*Sevier v. City of Lawrence,* 60 F.3d 695 (10th Cir. 1995) .......................................................... 22

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010)................................................................ 16

*Vox Mktg. Grp. v. Promos*,
    No. 2:18-CV-632-HCN, 2021 WL 3710130 (D. Utah Aug. 20, 2021) ................................... 24

*Weise v. Casper*, 593 F.3d 1163 (10th Cir. 2010).................................................................. 18, 19

*White v. Pauly*, 137 S. Ct. 548 (2017) ................................................................................... 17, 20

## Statutes

28 U.S.C. § 1367(a) ..................................................................................................................... 23

42 U.S.C § 1983 ............................................................................................................................. 1

Art. 1 § 9 Utah Constitution ............................................................................................ 1, 23, 25, 26

Art. 1 § 14 Utah Constitution  .......................................................................................... 1, 23, 25, 26

## Rules

Fed. R. Civ. P. 12(b)(6)................................................................................................................... 1

DUCivR 26-2(a)............................................................................................................................. 5

Defendants Salt Lake City Corporation (the "City") and Officer Matthew Farillas[1] (collectively, "Defendants") move to dismiss the First[2] and Second[3] Claims for Relief in Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. These claims (the "Federal Excessive Force Claims") are brought under 42 U.S.C § 1983. The Federal Excessive Force Claims must be dismissed because at the time of the events alleged in the Amended Complaint, no precedent clearly established that Officer Farillas's conduct was unconstitutional.

The third claim for relief alleges that SLCPD Chief Mike Brown and/or Salt Lake City Corporation violated their duties to adequately train police officers to avoid using excessive force. First Am. Compl. at ¶¶ 83-107. This claim is the subject of a separate Motion to Dismiss.

Plaintiffs' Fourth and Fifth Claims for Relief allege violations of the Utah Constitution: Art. 1 § 14 ("unreasonable searches and seizures") and Art. 1 § 9 ("unnecessary rigor"). The Court should exercise supplemental jurisdiction and dismiss these Utah Constitutional law claims because the legal standards used to analyze them are essentially identical to the standards that apply to the Federal Excessive Force Claims.

## INTRODUCTION

On the night of September 4, 2020, Golda Barton was worried about her 13-year old son, L.C. She and L.C. had had numerous interactions with police because of his multiple mental health challenges and resulting volatile behavior. Barton told police that he was "off the deep

---

[1] Plaintiff's Amended Complaint misspells the name of Officer Matthew Farillas. The name is spelled correctly in the City's caption.

[2] The first claim asserts Officer Matthew Farillas used excessive force in violation of 42 U.S.C § 1983. First Am. Compl. at ¶¶ 60-75.

[3] The second claim asserts Officer Farillas "continued" to use excessive force because he allegedly continued firing after L.C. had fallen. *Id.* at ¶¶ 76-82.

end," not taking his medications, "hallucinating," and "seeing people who aren't there." Barton did not think he had any real guns that night, but he had previously had an armed altercation (initially described as a "shootout" and later as a "standoff") with Nevada police. More recently, he had been in a "car chase" in Salt Lake City—he was driving someone's truck—in which he had been pursued by SLCPD officers. During the car chase, he had thrown some kind of fake gun out the window.

But on the night of September 4, 2020, Barton had had an especially disturbing conversation with L.C. That night, when L.C. learned that Barton was out with a male coworker, he yelled at her over the phone, "Oh, you're with that, that man worker? Oh, I'm gonna fucking shoot his ass!" Barton suspected L.C. had "gotten into" her older (16-year old) son's collection of guns. She called 911 for help getting L.C. to a hospital, saying, "I know as soon as I go in there, I don't know what he's going to do."

Officer Matthew Farillas responded with his fellow officers, Tyler Goodsell and Ally Hendrix. They met with Barton about half a block away from the house where she lived with her two sons, and where two tenants lived in the upstairs unit. It was after 10:00 p.m., and dark. Barton warned them that L.C. was sick, and had to be taken to Primary Children's Hospital for inpatient mental health treatment. She needed police to make that happen, "because with the way he acts, there's no way I could get him there myself." But she also warned them that he disliked law enforcement, would be "triggered" by seeing them, and would not cooperate. And she primed them to be on the lookout for weapons. She said that while she didn't "believe" he had a gun, he may have a BB gun, pellet gun, or something else that looked a real gun. Officers warned

her that they would have to treat anything that looked like a gun as if it were a real gun and she said, "Right. I know."

Barton was worried about what her son might do and that he would do something to get himself shot. But she was quite clear that despite the risks, "We have to do what we have to do because I can't live like this, literally. It's just, it's just, I can't have it. … I would like him transported to Primary Children's …. He hasn't been able to control himself." The officers decided to call for a fourth, and later a fifth, officer to assist them.

After conferring with Barton and strategizing about the best way to approach the situation, the officers decided to just go talk to L.C. The fourth and fifth officers (Officer Bennett and a trainee) approached the house from the rear alley. Goodsell and Hendrix quietly walked up to the front door. Farillas waited at the end of the driveway to the side of the house so that he could see if L.C. ran out the back door. Goodsell knocked gently, and a few seconds later, L.C. fled out the back door. Officer Farillas yelled, "Hey, police! Stop running!" Officer Goodsell yelled, "Freeze! Show me your hands!" Officer Bennett, just arriving to the scene, yelled "Stop! Get on the ground! Knock it off!" L.C. did not obey any of their orders and instead ran through the dark, unlit back alley. Officer Farillas ran after him, warning Officer Bennett, "he might have a gun."

L.C. rounded a blind corner and slowed. He was not surrendering. He was walking sideways, still moving away from Farillas. Officer Farillas yelled, "Get on the ground! Get on the ground! On the ground now!" L.C. said, "No." It was dark, and Farillas's flashlight primarily illuminated L.C.'s feet and legs. But the poorly-lit freeze-frame images from Farillas's body camera video show one of L.C.'s hands moving around down near his waistband. Officer

Bennett yelled, "Pull your hands out, dude! Pull your hands out!" The video shows one of L.C.'s hands moving back up from his waistband area moments before Farillas fired on L.C., who was later found to be unarmed. L.C. survived the shooting but alleges he was seriously injured.

Officer Farillas did not have the luxury of carefully reviewing body camera video before deciding how to act. He faced a mentally unstable, possibly armed juvenile who had threatened to shoot someone earlier. L.C.'s mother practically begged that he be taken in for mental health treatment. She knew force would likely be necessary because L.C. would resist, warned he might have something that looked like a real gun, and understood this would be dangerous. Farillas was forced to make a split-second life-or-death decision with limited information in extremely poor lighting, during an encounter that was tense, uncertain, and rapidly evolving. These facts make this case unlike any other that would have marked the bounds of constitutional behavior for Officer Farillas. Consequently, the Federal Excessive Force Claims must be dismissed based on the second prong of qualified immunity analysis, because the law was not clearly established that Officer Farillas's use of deadly force was unconstitutional under the particular circumstances he faced.

## STATEMENT OF MATERIAL FACTS

The following facts are taken from Plaintiff's First Amended Complaint, as well as the police body camera videos and 911 call recording that Plaintiffs reference in the First Amended Complaint.[4] For purposes of a motion to dismiss, these facts are assumed to be true.

---

[4] In considering a motion to dismiss, the Court should consider not only the complaint but the attached exhibits or material referenced in the complaint. *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011); *Tellabs, Inc. v. Makkor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Needham v. Fannie Mae*, 854 F. Supp. 2d 1145, 1148 (D. Utah 2012) ("If the rule were otherwise, a plaintiff with a deficient claim

1.      Plaintiff Golda Barton is the mother and sole caretaker of L.C., who was 13 years old at the time of the events alleged. First Am. Compl. ¶¶ 1, 10.

2.      Officer Matthew Farillas was, and is, a Salt Lake City Police Department (SLCPD) employee. *Id.* ¶ 2.

3.      Chief Mike Brown is SLCPD's Chief of Police. *Id.* ¶ 3.

4.      Salt Lake City Corporation (the City) runs the SLCPD and employs both Officer Farillas and Chief Brown. *Id.* ¶ 4.

5.      L.C. has autism and Asperger's syndrome. *Id.* ¶ 11.

---

could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied").

In their First Amended Complaint, Plaintiffs repeatedly reference and quote from the 911 call from Golda Barton to SLCPD dispatch, as well as the body cameras worn by police officers who responded to the scene. *See, e.g.,* First Am. Compl. at ¶¶ 18-20, 37, 65, 97. Regarding body cameras specifically, Plaintiffs allege that "Doe Defendants deliberately de-activated the audio on their body-worn cameras during critical and active times during the events alleged herein." First Am. Compl. at ¶ 65. Plaintiffs also allege the City is liable "[b]ased on the body-worn cameras of Officer Farilla [sic] and the other SLCPD officers." *Id.* at ¶ 97.

Thus, Plaintiffs' First Amended Complaint not only references body camera recordings of the officers who responded to Barton's call for help on the night of September 4, 2020; it is actually "based on" those recordings. Therefore, this Motion to Dismiss likewise references, quotes from, and is based on the 911 dispatch recording and body camera video recordings of the four main officers who were at the scene before the shooting. The 911 dispatch recording ("911 Call Recording") is attached as Exhibit 1 and the body camera video recordings of Officer Matthew Farillas, Todd Goodsell, Ally Hendrix, and Shawn Bennett are attached as Exhibit 2 ("Farillas Bodycam"), Exhibit 3 ("Goodsell Bodycam"), Exhibit 4 ("Hendrix Bodycam") and Exhibit 5 ("Bennett Bodycam"). The 911 Call Recording and all the body camera videos are designated as "confidential" pursuant to DUCivR 26-2(a), and are filed under seal. While redacted portions of the videos are publicly available, the full, unredacted versions (which contain private information about L.C. and some post-shooting investigation) are provided to the Court for its review of this Motion to Dismiss.

**A.      L.C. Is "Out of Control," Possibly Armed, and Has Threatened to Shoot Someone, So Barton Calls 911 Asking for Police to Take Him to Psychiatric Treatment.**

6.       On September 4, 2020, Barton called 911 to request a Crisis Intervention Team to take L.C. to Primary Children's Hospital. *Id.* ¶ 19.

7.       Barton told the 911 operator, among other things:

   a.   L.C. "had a high-speed chase with the police," 911 Call Recording at 0:40;
   b.   "my son's out of control," *id.* at 0:50;
   c.   "he needs to go to the hospital;" *id.* at 0:51;
   d.   L.C. had threatened to "break every window in the fucking house;" *id.* at 1:30; and
   e.   L.C. had threatened, "I'm gonna fuckin' shoot" Barton's employee. *Id.* at 1:33.

8.       When the 911 operator asked Barton, "does he have access to a gun," Barton paused, and then responded:

> Um, no, not that I believe. Well, I don't know, honestly, because, I don't believe so, but, um, like I told the officers in the past, he had a shootout with police in Lyon County, um, and they did nothing. Nobody does anything. Um, and he's sick. He needs to go to the hospital.

911 Call Recording at 1:53.

9.       She also said he had showed her worker some kind of realistic looking prop weapon, BB gun, pellet gun, or "some type of a, a gun … but it wasn't like a real, like a, like a big weapon." 911 Call Recording at 2:50.

10.       Barton told the 911 dispatcher that she suspected L.C. had "gotten into" her older son's guns. She said that while her older son claimed he had secured his guns, "I'm guessing that [L.C.] has gotten into that. I just haven't even gotten home to deal with that." *Id.* at 3:27.

6

11.     Barton said it was "super important" to get her son to a mental health worker. *Id.*
at 4:13. She said, "he's sick. He has hallucinations. Um, he's off and has been refusing to take
his medications. *Id.* at 4:15.

12.     She was insistent that she needed police to take him to mental health professionals
at Primary Children's Hospital "because with the way he acts, there's no way I could get him
there myself." *Id.* at 4:17.

13.     She noted that she had tenants who were living in an upstairs apartment of the
same house L.C. was in that night. *Id.* at 4:40.

14.     She repeatedly expressed concern about what would L.C would do if she
attempted to go in the house. *See, e.g., id.* at 4:53 ("I know as soon as I go in there, I don't know
what he's going to do. He's so mad").

15.     She said, "My biggest fear is that, um, that, I don't know, I just don't want him to
die." *Id.* at 6:22.

16.     She said that she had been having to call police about her son every night. But in
the past when police would arrive, L.C. "has been gone, like he'll take off and go running." *Id.* at
6:30. That is why, she said, this time she was calling from the street a few houses down from the
house where L.C. was located. *See id.* She said this was the best time for police to take L.C. to
the hospital, "because he's not expecting you." Goodsell Bodycam at 7:58.

17.     She told the 911 operator about a previous incident between L.C. and police
officers in Nevada. She complained that the police in that previous incident did not do enough to
get L.C. under control. She asked,

> What kind of a kid goes on a frickin', uh, frickin' shootout with the cops, and the
> cops just say, 'well, it doesn't look like he's coming out, so uh, you go over to the

motel, and I don't want you to come back to that house until uh, 11:00 tomorrow morning.' And my son's got, uh, at that time he had a .22 and I think a 9mm of my dad's. … I had to call because he wouldn't put the guns down. It was so scary. … My dad had over a hundred guns.

*Id.* at 12:43.

**B.**      **Officers Meet with Barton and Strategize About How to Deal with L.C. While Minimizing Risks to All Involved.**

18.      Officer Matthew Farillas and "at least three other SLCPD officers" responded to Barton's 911 call. First Am. Compl. at ¶ 20. The officers met with Barton near her house, where L.C. was located. *Id.* at ¶ 20, 26; Farillas Bodycam at 3:00; Goodsell Bodycam at 3:00; Hendrix Bodycam at 2:45. Officer Bennett and a recruit he was training approached the house from a rear alley. Bennett Bodycam at 0:30.

19.      Officer Goodsell took the lead in discussing the situation with Barton, with Farillas and Hendrix standing nearby. Barton said that L.C. had expressed "suicidal tendencies, things like that, yes, every frickin' day." Goodsell Bodycam at 7:20.

20.      Barton warned officers that L.C. may have something that looks like a gun. She also again referenced her older son, whose guns she believed L.C. might have "gotten into." She said, "I don't know if it's a BB gun, I don't know if it's a pellet gun, I don't know if it's a prop weapon, because my other son—I don't believe it's a real gun." Farillas Bodycam at 6:46.

21.      Officer Goodsell warned her: "so unfortunately, we have to kind of treat them all as if they are …," to which Barton responded, "Right. I know." *Id.* at 6:54.

22.      Officer Goodsell asked whether L.C. had threatened to hurt anyone that night. Goodsell Bodycam at 7:20.

23.     Barton told Officers Farillas and Goodsell that L.C. threatened to shoot one of her workers: "He [L.C.] said, 'oh, you're with that, that man worker? Oh, I'm gonna fucking shoot his ass!" *Id.* at 7:43.

24.     Officer Goodsell asked if there was anyone else in the house at that time, and she told him and Officer Farillas that she had renters upstairs. *Id.* at 7:56.

25.     She also told officers that her older son was in the house with L.C. Goodsell Bodycam at 12:12.

26.     Barton made it clear that despite L.C.'s distaste for law enforcement officers and sensory disorder, it was not an option for the officers to simply walk away without attempting to take L.C. in for mental health treatment: "We have to do what we have to do because I can't live like this, literally. It's just, it's just, I can't have it. … I would like him transported to Primary Children's …. He hasn't been able to control himself." *Id.* at 8:32.

27.     Barton said, "He's off the deep end. … Sometimes he sees people that aren't there." Goodsell Bodycam at 9:10.

28.     Barton said L.C. "does not like law enforcement." She said, "He sees the badge and automatically thinks, like, you're going to kill him, or he has to defend himself." Farillas Bodycam at 8:30. She said L.C. would react to the police uniforms, "but there's nothing we can do about that, because you're the only people we can call." Goodsell Bodycam at 3:46.

29.     Barton told the officers that L.C. showed one of her coworkers something resembling a gun, like a BB gun, pellet gun, or prop gun. Goodsell Bodycam at 6:45.

30.     In summary, the situation up to this point was that L.C.'s mother was literally desperate for police to take her psychologically unstable son into custody and put him in the care

of mental health professionals. She warned that he was volatile and hostile to law enforcement, and he would try to defend himself from the officers. At the same time, she repeatedly emphasized that they had to deal with him that night. She had told the 911 operator that he had previously been in a "shootout," had possessed .22 and 9mm guns, and may have "gotten into" her older son's gun collection. She told the officers on the scene that L.C. had threatened to "shoot" someone earlier that night. And she said that while she did not "believe" he had a real gun, she warned that might have a BB gun, pellet gun, or prop gun. She understood that the officers would have to assume that things that look like real guns were real guns.

31.     Barton suggested to Officers Goodsell, Farillas, and Hendrix that she go into the house first, so that L.C. would not realize immediately that police officers were there to take him to the hospital. Goodsell explained, "So, at this point, I need to worry about my safety, and my partners' safety, so we kind of just have to do our thing." Farillas Bodycam at 11:50.

32.     Officer Hendrix told Barton that she should stay behind them and outside: "We're going to leave you out of the equation and keep you out here, if that's okay. … We just don't want your safety to be compromised." Hendrix Bodycam at 11:58.

33.     The officers reconfirmed that Barton had two tenants living upstairs in the house, and that L.C.'s older brother was also in the house with him. *Id.* at 12:07.

34.     Barton said she was worried but emphasized that the officers had to deal with the issue even though she knew it would trigger a hostile response from L.C. Goodsell Bodycam at 8:45.

**C.**   **Officers Approach L.C.'s House to Talk to Him.**

35.     The First Amended Complaint alleges that the officers then "descended on L.C.'s home with guns drawn." First Am. Compl. at ¶ 35. However, the body camera videos blatantly contradict that allegation. Rather, Officer Goodsell described the plan this way: "And so we're just gonna go talk to him and see what we got at that point." *Id.* at 12:03. And later: "let's go talk to him and we'll kinda go from there." Goodsell Bodycam at 8:26.

36.     After conferring some more with Barton and the other officers about strategy, Officer Goodsell radioed for a fourth officer (Officer Bennett) to approach from the east. Goodsell Bodycam at 11:32. A minute later, Officer Farillas asked Officer Goodsell if they should call for a fifth officer, and Officer Goodsell told him to call for a fifth officer to stage from the east as well. Farillas Bodycam at 12:30.

37.     In total, the officers spent almost 10 minutes conferring with Barton and amongst themselves about the situation and their strategy for dealing with L.C. *See* Goodsell Bodycam at 3:10-12:50.

38.     In keeping with their plan to just go and talk to L.C., Officers Goodsell, Hendrix, and Farillas approached the house in a calm and restrained manner. As the officers approached the house, they made no threatening movements, made no threatening sounds, and uttered no threats or commands. Goodsell Bodycam at 12:52; Hendrix Bodycam at 12:50.

39.     The officers did not approach "with guns drawn." *See, e.g.,* Hendrix Bodycam at 15:55 (showing Officer Goodsell approaching house with no gun in hand).

40.     Officer Farillas held position at the end of the driveway so that he could see the back door in case L.C. attempted to flee out the back of the house. Farillas Bodycam at 15:39.

41.     Officer Goodsell knocked gently on the front door. He did not yell or say anything. Goodsell Bodycam at 16:22.

**D.      L.C. Flees into the Dark Alley Behind the House, Defies Officers' Commands, and Officers Pursue Him.**

42.     Instead of answering the door, L.C. ran out the back of the house and into the back yard. First Am. Compl. at ¶¶ 36-37.

43.     Officer Farillas shouted to L.C., "Hey, police! Stop running!" Farillas Bodycam at 16:42.

44.     L.C. did not stop running. *Id.*

45.     Officers Goodsell and Farillas ran toward the back yard but then slowed and stopped. It was nighttime, and the back yard was completely dark. They approached the back yard cautiously, illuminating the yard with their flashlights before entering the back yard area. They concluded L.C. must have jumped over the fence into the back alley. *See id.* at 16:50.

46.     Officer Bennett was approaching the house from the rear alley. He saw L.C. and said, "Stop! Get on the ground! Knock it off!" L.C. ignored Bennett's commands, and instead turned and ran back the way he had come. Bennett Bodycam at 0:35.

47.     Officer Goodsell yelled, "Freeze! Let me see your hands!" Farillas Bodycam at 17:07.

48.     Bennett yelled to the other officers, "Back to you guys! Coming back to you!" Bennett Bodycam at 0:39.

49.     Officer Farillas broke through the fence to pursue L.C. down the alley. Farillas Bodycam at 17.24.

12

50.     As Officer Farillas was running down the alley, he yelled, "he might have a gun." *Id.* at 17:33.

51.     Officer Farillas yelled at L.C., "Police! Stop!" *Id.* at 17:41.

52.     L.C. did not stop. Instead, he kept running, and rounded a corner with a fence on the side that blocked Officer Farillas's view. *Id.* at 17:54.

53.     Officer Farillas slowed and cautiously edged around the fence on the corner, shining his flashlight in the direction L.C. had run. *Id.* at 17:55.

**E.     L.C. Stops Running, Turns, Moves His Hands Near His Waistband, and Refuses to Surrender.**

54.     L.C. had stopped running, and was walking sideways away from Officer Farillas, but with his body partially turned toward Officer Farillas. *Id.* at 17:58.

55.     Officer Farillas yelled, "Get on the ground! Get on the ground! On the ground now!" *Id.* at 17:58.

56.     L.C. said, "No." *Id.* at 18:02.

57.     Officer Bennett, running behind Officer Farillas, rounded the corner next. He yelled, "Pull your hands out, dude! Pull your hands out!" Bennett Bodycam at 1:28. Bennett saw that L.C. had his hands tucked in his waistband, so he moved out into the road to Farillas's left so that he could "get a cross angle on [L.C.]." *Id.* at 6:19.

58.     Plaintiffs allege that Officer Farillas was "shining a light on L.C. and it was evident that L.C. did not possess any weapon in his hands." First Am. Compl. at 44. However, this allegation is blatantly contradicted by Officer Farillas's body camera video. The video shows that Officer Farillas's flashlight mostly illuminated the sidewalk, with part of the flashlight beam

illuminating L.C.'s feet and legs. The video shows that it was *not* evident that L.C. did not

possess any weapons in his hands. *See* Farillas Bodycam at 17:59-18:09.

59.     It is evident from the video that L.C. never made any motions to signify he was

going to get on the ground or stop fleeing. *See id.* Instead, he made furtive movements with one

hand, moving it down to his waistband and back up again, while continuing to move away from

Officer Farillas. *See id.*

60.     Still frame images from Officer Farillas's body camera show momentary glimpses

of one of L.C.'s hands. L.C. moved his hand from near his waistband up to shoulder height just

before Officer Farillas fired his weapon. *See* Farillas Bodycam Still Frame Images, attached in

sequence as Exhibit 6. A freeze frame image from Officer Farillas's body camera depicts the

scene moments before he pulled the trigger:



61.     While another officer was shouting "Get on the ground," Officer Farillas shot at

L.C. *Id.* at 18:05.

62.     In the moments after L.C. was shot, Officer Farillas yelled at L.C.: "Show me

your hands! Show me your hands!" Farillas Bodycam at 18:11. Officer Goodsell yelled: "Let me

see your hands!" Goodsell Bodycam at 18:18.

63.     Officer Farillas fired his weapon 11 times over the course of roughly 2.5 seconds,

and he stopped firing as soon as L.C. was visible on the ground. Bennett Bodycam at 1:30.

64.     L.C. was unarmed. First Am. Compl. at 12.

## ARGUMENT

**I.     RULE 12(B)(6) STANDARD OF REVIEW.**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be

dismissed for "failure to state a claim upon which relief can be granted."[5] When considering a

motion to dismiss, the Court must "accept all the well-pleaded allegations of the complaint as

true and must construe them in the light most favorable to the plaintiff.[6] Nevertheless, a claim

must be dismissed if the complaint does not contain enough facts to make the claim "plausible on

its face."[7] "'A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.'"[8] Further, a complaint must allege "more than labels and conclusions" or "a formulaic

---

[5] FED. R. CIV. P. 12(b)(6).
[6] *See Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697, 700 (10th Cir. 2014).
[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[8] *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

recitation of the elements of a cause of action," and it must "raise a right to relief above the speculative level."[9]

While the Court must usually accept "all the well-pleaded allegations of the complaint,"[10] "that is not true to the extent that there is clear contrary video evidence of the incident at issue."[11] Rather, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court *should not* adopt that version of the facts."[12] Courts therefore disregard allegations that amount to a "visible fiction" and instead "view[] the facts in the light depicted by the videotape."[13]

## II.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Plaintiffs' claims all arise out of the same shooting incident. Since Officer Farillas is entitled to qualified immunity for that shooting, the Federal Excessive Force Claims and state constitutional claims against all Defendants should all be dismissed. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[14] "Qualified immunity balances two important interests—the need to hold public officials

---

[9] *Twombly*, 550 U.S. at 555.
[10] *Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697, 700 (10th Cir. 2014).
[11] *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).
[12] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also Rowell v. Bd. of Cty. Comm'rs. of Muskogee Cty., Okla.*, 978 F.3d 1165, 1171 (10th Cir. 2020) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."); *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) ("To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony.").
[13] *Scott*, 550 U.S. at 381; *see also Farrell-Cooper Min. Co. v. U.S. Dep't of Int.*, 728 F.3d 1229, 1237, n.6 (10th Cir. 2013) ("[F]actual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true.") (citation simplified).
[14] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotations omitted).

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably."[15]

> Damages actions against public officials under § 1983 ... impose "substantial
> social costs." They threaten potentially significant personal liability for actions
> that arise out of the performance of official duties, and they can subject officials
> to burdensome and distracting litigation. This could lead to undesirable ex ante
> effects: reticence of officials in carrying out important public functions and,
> perhaps worse, a general disaffection with public service, rooted in the calculation
> that its costs simply outweigh its benefits.[16]

> In the last five years, this Court has issued a number of opinions reversing federal
> courts in qualified immunity cases. ... The Court has found this necessary both
> because qualified immunity is important to society as a whole, ... and because as
> an immunity from suit, "qualified immunity is effectively lost if a case is
> erroneously permitted to go to trial."[17]

"After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff," who

must then satisfy a "heavy two-part burden" for the claims to survive.[18] First, the plaintiff must

show that the facts, taken in the light most favorable to the plaintiff, show that the challenged

conduct violated a constitutional right.[19] Second, the plaintiff must also show the specific

constitutional right at issue was clearly established at the time the violation occurred.[20]  The

---

[15] *Pearson v. Callahan*, 555 U.S. 223, 233 (2009).

[16] *Pahls v. Thomas*, 718 F.3d 1210, 1226–27 (10th Cir. 2013) (citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

[17] *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (some internal quotations and citations omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, (2009)).

[18] *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005); *See also, Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2000).

[19] *Phillips*, 422 F.3d at 1080 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).)

[20] *Id.*

Court may consider these two questions in either order,[21] but a failure to establish either inquiry is fatal to a plaintiff's claim.[22]

A. **Plaintiffs Must Cite Binding Precedent Involving Similar Facts to Show that "Clearly Established" Law Forbade Officer Farillas's Conduct in the Circumstances Alleged Here.**

This Motion focuses only on the second prong of the qualified immunity analysis because, based on the First Amended Complaint and the body camera videos referenced therein, Officer Farillas did not violate clearly established law. Defendants are not moving on the first prong of qualified immunity at this stage because, as pled, this is already a textbook example of a case that should be dismissed for lack of "clearly established" law. Additional evidence (especially eyewitness testimony) would bolster Defendants' argument that there was no first prong constitutional violation here. But the facts alleged in the First Amended Complaint and incorporated by Plaintiffs' reference to the 911 call and the body camera videos are more than enough to find that no clearly established law forbade Officer Farillas's conduct.

While the "clearly established" prong of qualified immunity was once considered the second step in a two-stage analysis, in *Pearson v. Callahan*,[23] the Supreme Court ruled that courts could apply the "clearly established prong" of the qualified immunity analysis first—that is, without first deciding whether the defendant violated a constitutional right. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in

---

[21]  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 235–36 (2009)).

[22]  *See, e.g., Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity.").

[23]  555 U.S. 223, (2009).

light of the circumstances in the particular case at hand."[24] Thus, it is unnecessary to analyze the

first prong (constitutional violation) where it is clear that the law was not "clearly established"

and the case can be dismissed on the second prong alone.[25] The Court must dismiss Plaintiffs'

claims unless they can show that binding case law "clearly established" it was a violation of

L.C.'s Fourth Amendment rights for Officer Farillas to use deadly force under the circumstances

of this case.[26]

     For a right to be "clearly established," the contours of the right must be sufficiently clear

so as to give officials fair warning that their conduct is unconstitutional.[27] "Clearly established"

does "not require a case directly on point, but existing precedent must have placed the statutory

or constitutional question beyond debate."[28] " The case need not be identical to the one here, but

it must be so similar that "every reasonable officer" would know that his or her actions were

unlawful."[29]

     The inquiry "must be undertaken in light of the specific context of the case, not as a

broad general proposition."[30] The "clearly established law must be 'particularized' to the facts of

---

[24] *Pearson*, 555 U.S. at 236.

[25] *See City of Talequah v. Bond*, 595 U.S. ___, 142 S. Ct. 9, 11 (2021) ("We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment. On this record, the officers plainly did not violate any clearly established law.").

[26] *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (analyzing the second prong of qualified immunity where it was unclear from the pleadings alone whether defendants had violated plaintiff's constitutional rights).

[27] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[28] *Ashcroft v. al-Kidd*, 563 U.S. at 741

[29] *Palacios v. Salt Lake City Police Dep't*, Case No. 2:20-cv-00714-DBB, 2022 WL 605005, *17 (D. Utah March 1, 2022) (slip copy) (finding no clearly established law forbade police chasing and shooting a man who had committed armed robberye, fled from police and refused orders to stop, and appeared to be reaching for his gun).

[30] *Brosseau v. Haugen, 543 U.S. 194, 198 (2004)* (per curiam) (internal quotations omitted).

the case."[31] The "specificity" regarding the particular circumstances is "especially important in

the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how

the relevant legal doctrine, here excessive force, will apply to the factual situation the officer

confronts."[32] To survive a motion to dismiss on the "clearly established" prong of qualified

immunity, Plaintiffs must cite cases where an officer was held to have violated the Fourth

Amendment under circumstance similar to those faced by Officer Farillas that night.[33]

The recent Supreme Court case of *City of Talequah v. Bond* illustrates how essential it is

to find prior case law involving facts similar enough that they can be "particularized" to the facts

of L.C's case.[34] In *Bond*, the decedent's ex-wife called police asking for help to get her ex-

husband (Dominic Rollice) out of her garage.[35] Three officers responded and spoke to Rollice in

the doorway of the garage. He appeared nervous and refused to be pat down for weapons. One of

the officers took one step toward the doorway, and Rollice took a step back. Rollice turned and

walked toward the back of the garage where his tools were located. The officers followed Rollice

further into the garage. The officers ordered Rollice to stop, but he kept walking. Then he picked

up a hammer and turned to face the officers. "Rollice grasped the hammer with both hands, as if

---

[31] *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[32] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

[33] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("The panel majority misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."); *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) (noting "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a clearly established right, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (internal alterations and quotations omitted)).

[34] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[35] *City of Talequah v. Bond*, 595 U.S. ___, 142 S. Ct. 9, 10 (2021).

preparing to swing a baseball bat, and pulled it up to shoulder level." [36] The officers backed up, drew their guns, and yelled at Rollice to drop the hammer. Rollice refused.[37] Instead of complying, Rollice stepped to his right so that there were no obstructions between him and the officers. Then he raised the hammer up as if to throw the hammer or charge the officers, at which point the officers shot and killed Rollice.[38]

Rollice's estate filed a Section 1983 suit alleging violation of the Fourth Amendment right to be free from excessive force. The district court held the officers were entitled to qualified immunity because there was no clearly established case law at the time of the shooting that would have put the officers on notice that their conduct would violate the Constitution.[39] The Tenth Circuit disagreed and reversed, taking the position that the law was clearly established.

The Tenth Circuit relied heavily on *Allen v. Muskogee* to find that precedent clearly established that the officers' conduct was unlawful.[40] In *Allen*, officers responded to the scene of an armed, suicidal man sitting in his car, threatening others. The officers told the man to drop his gun, and started physically reaching into the car from both sides, trying to restrain the man and grab his gun.[41] In the tussle, the man pointed the gun at officers, and they shot him.[42] The Tenth Circuit synthesized a general rule from *Allen* in an attempt to find a "clearly established" law that forbade the officers from shooting Rollice. The court reasoned that:

---

[36] *Id.* at 10-11.
[37] *Id.* at 11.
[38] *Id.* at 11.
[39] *Burke v. City of Talequah*, Case No. CIV-18-257-RAW, 2019 WL 4674316, *5 (E.D. Okla. Sept. 25, 2019) (unpublished) ("This court finds plaintiff has not met the second prong of the qualified immunity analysis either.").
[40] *City of Talequah v. Bond*, 142 S. Ct. at 11.
[41] *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).
[42] *Id.*

> an officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property.[43]

But the Supreme Court reversed the Tenth Circuit. It rejected the Tenth Circuit's attempt to synthesize this broad rule from the facts of *Allen*, at least insofar as it would clearly establish that the officers should have known the use of force was unconstitutional in the particular circumstance they faced:

> Not one of the decisions relied upon by the Court of Appeals—*Estate of Ceballos v. Husk*, 919 F.3d 1204 (CA10 2019), *Hastings v. Barnes*, 252 Fed.Appx. 197 (CA10 2007), *Allen*, 119 F.3d 837, and *Sevier v. Lawrence*, 60 F.3d 695 (CA10 1995)—comes close to establishing that the officers' conduct was unlawful. The Court relied most heavily on *Allen*. But the facts of *Allen* are dramatically different from the facts here. The officers in Allen responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. 119 F.3d, at 841. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was unlawful.[44]

The Supreme Court also discussed the Tenth Circuit's reliance on *Sevier v. City of Lawrence*.[45] Officers in *Sevier* responded to a call from parents whose adult son had a knife and was acting suicidal.[46] The officers confronted the man in his room from the hallway, ordering him to drop his knife, which he refused to do. Eventually he moved into the hall and moved in a threatening way with the knife, and officers shot him.[47] The Supreme Court explained that *Sevier* "merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of

---

[43] *Bond v. City of Talequah*, 981 F.3d 808, 825 (10th Cir. 2020) (internal quotation omitted).

[44] *City of Talequah v. Bond*, 142 S. Ct. at 12.

[45] *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995).

[46] *Sevier*, 60 F.3d at 697-98.

[47] *Sevier*, 60 F.3d at 698.

force excessive …. [But] that formulation of the rule is much too general to bear on whether the officers' particular conduct here [in *City of Talequah v. Bond*] violated the Fourth Amendment."[48] The takeaway lesson is that it is not enough to analogize or synthesize a general rule from prior cases when considering whether the law was clearly established. Rather, a prior case must involve facts so similar that the case "clearly established" the law for the second prong of the qualified immunity analysis. Here, just as in *City of Talequah v. Bond*, there is no case law that "clearly established" that Officer Farillas's conduct was reckless or that his ultimate use of force against L.C. was unconstitutional, and Plaintiffs cannot satisfy their burden under qualified immunity's second prong.

## III.   THE STATE CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED FOR THE SAME REASONS AS THE FEDERAL EXCESSIVE FORCE CLAIMS.

Plaintiffs' claims under Article 1, sections 9 ("unnecessary rigor") and 14 ("unreasonable searches and seizures") of the Utah Constitution must also be dismissed. The Court has supplemental jurisdiction over the Utah constitutional claims because they arise out of the same facts and the legal standards involved are identical to those that apply to their federal claims. 28 U.S.C. section 1367(a) provides "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

> [P]rinciples of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that derive from a common nucleus of operative fact, such that the relationship between the federal claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case.[49]

---

[48] *City of Talequah v. Bond*, 142 S. Ct. at 12.

[49] *Vox Mktg. Grp. v. Promos*, No. 2:18-CV-632-HCN, 2021 WL 3710130, at *7 (D. Utah Aug. 20, 2021) (quoting *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164–65 (1997)).

The Court should exercise its supplemental jurisdiction to dismiss the Utah constitutional claims.

"In order to recover monetary damages for a constitutional violation, the Utah Supreme Court requires a plaintiff to … establish three elements: (1) the plaintiff suffered a flagrant violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[50]

Plaintiffs cannot satisfy the first and second elements because there is no Utah case law holding that Officer Farillas's use of force in this situation was unconstitutional, and these claims are adequately addressed under Section 1983. With respect to the first element, to establish a flagrant violation of one's constitutional rights a "defendant must have violated clearly established constitutional rights of which a reasonable person would have known."[51] "To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[52] "The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering him or herself liable for a constitutional violation."[53]

Applying this standard in _Wood v. Farmington City,_ the Utah federal district court held plaintiff could establish "no flagrant violation" of rights under Article I, section 9 or section 14 when a deputy used deadly force because the deputy "had a reasonable basis for using lethal

---

[50] _Wood v. Farmington City_, 910 F. Supp. 2d 1315, 1326 (D. Utah 2012).
[51] _Id._ at 1328-29.
[52] _Id._ at 1329.
[53] _Id._

force against [the decedent]."[54] Specifically, the deputy was "responding to what he perceived to be an immediate threat to himself and other officers" and as the court had discussed with respect to the plaintiffs' 1983 claims, "it was not objectively unreasonable for [the deputy] to believe [the suspect] posed a serious threat of physical harm."[55] Just as in *Wood*, Plaintiffs cannot establish their claims under Article I sections 9 and 14 because there is no Utah case law establishing that Officer Farillas's actions flagrantly violated L.C.'s rights.

With respect to the second element, Utah Constitutional claims must be dismissed if the injuries alleged are adequately addressed through a Section 1983 claim.[56] For example, in *Mglej v. Garfield County,* this Court dismissed plaintiff's claims under Article I, sections 9 and 14 of the Utah Constitution because plaintiff claimed "exactly the same damage for the state causes of action as he did for his § 1983 claim."[57] This, the court found, showed Section 1983 provided an adequate remedy and the claims were dismissed.[58] Just like the plaintiff in *Mglej*, Plaintiffs assert exactly the same damage for both their Federal Excessive Force Claims and their claims under Article I, sections 9 and 14 of the Utah Constitution.

In short, Plaintiffs cannot establish two essential elements to recover damages for an alleged violation of Utah Constitutional rights, so their state law claims must also be dismissed.

---

[54] *Id.* at 1328-29.

[55] *Id.*

[56] *Cavanaugh v. Woods Cross City*, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, at *6 (D. Utah Dec. 14, 2009), *aff'd*, 625 F.3d 661 (10th Cir. 2010) (dismissing state constitutional claims because plaintiffs' injuries could be fully addressed through their 42 U.S.C. § 1983 claims); *Mglej v. Garfield Cty.*, No. 2:13-CV-713, 2014 WL 2967605, at *4 (D. Utah July 1, 2014) (same).

[57] *Mglej,* 2014 WL 2967605, at *4 ("To proceed, [plaintiff] must show that existing remedies under Title 42 U.S.C. § 1983 do not provide redress for his injuries. This he fails to do. Indeed, [plaintiff's] claims exactly the damage for the state causes of action as he does for his § 1983 claim.").

[58] *Id.*

## **CONCLUSION**

The police officers in this case did not seek out this tragedy. They were called upon by Barton and their duty to public safety to do something about an out-of-control, mentally unstable young man who disliked police, might have been armed, and had threatened to shoot someone earlier. Officer Farillas responded to a tense, uncertain, and rapidly evolving situation without any clearly established case law to instruct that his actions were unconstitutional under the circumstances. Defendants therefore respectfully ask the Court to dismiss Plaintiffs' Excessive Force Claims with prejudice.

DATED this 11th day of March, 2022.

  /s/  David F. Mull
DAVID F. MULL
*Attorney for Defendants Officer Matthew*
*Farillas; Chief Mike Brown; and Salt Lake*
*City Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of March, 2022, a true and correct copy of the

**Motion to Dismiss** was electronically filed with the Clerk of the Court, which sent notice to:

Nathan S. Morris
EISENBERG CUTT KENDELL & OLSON
215 South State Street, Suite 900
Salt Lake City, Utah 84111
nmorris@eckolaw.com
*Attorney for Plaintiff Golda Barton and L.C.*

Zachary J. Weyher
TRUE WEST LEGAL
1953 South 1100 East, #521524
Salt Lake City, Utah 84152
weyherlaw@gmail.com
*Attorney for Plaintiff Golda Barton and L.C.*

Jeffrey D. Gooch
Kevin K. Robson
JONES WALDO HOLBROOK & MCDONOUGH, P.C.
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
jgooch@joneswaldo.com
*Attorney for Plaintiff Michael Cameron and L.C.*

　　　　　　　　　　　　　　 /s/  Heidi Medrano

27